**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Cedar Lane Technologies Inc.,**<br>Plaintiff,<br>v.<br>**City National Rochdale, LLC,**<br>Defendant. | Case No. 1:25-cv-7845<br>Patent Case<br>Jury Trial Demanded |

## SECOND COMPLAINT FOR PATENT INFRINGEMENT

1. Plaintiff Cedar Lane Technologies Inc. ("Plaintiff"), through its attorneys, complains of City National Rochdale, LLC ("Defendant"), and alleges the following:

## PARTIES

2. Plaintiff Cedar Lane Technologies Inc. is a corporation organized and existing under the laws of Canada that maintains its principal place of business at 471 Baker St., Nelson, BC, V1L 4H7.

3. Defendant City National Rochdale, LLC is a limited liability company organized and existing under the laws of Delaware that maintains an established place of business at 400 Park Avenue, New York, NY 10022.

## JURISDICTION

4. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

5. This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in this District. As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

**VENUE**

7. Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant has an established place of business in this District. In addition, Defendant has committed acts of patent infringement in this District, and Plaintiff has suffered harm in this district.

**PATENT-IN-SUIT**

8. Plaintiff is the assignee of all right, title and interest in United States Patent No. 8,577,782 (the "Patent-in-Suit"); including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the Patent-in-Suit. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the Patent-in-Suit by Defendant.

**THE '782 PATENT**

9. The '782 Patent is entitled "Trading with conditional offers for semi-anonymous participants," and issued 2013-11-05. The application leading to the '782 Patent was filed on 2010-04-08. A true and correct copy of the '782 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Prior to the invention of the '782 Patent, conventional electronic trading systems and methods suffered from significant technical problems and deficiencies that resulted in computational inefficiencies and suboptimal resource allocation in securities and futures trading. These conventional systems relied on anonymous trading mechanisms where buyers and sellers

had no access to information about the trading behavior patterns of their counterparties, resulting in uniform pricing that failed to account for material differences between trading entities.

11. The conventional trading systems of the prior art had several technical problems. For example, traditional electronic trading systems "are structured so that the identity of Takers and Providers is unknown to the other participant. Hence, Takers and Providers trade goods at prices that are established in a way that is unrelated to information about the transacting parties." '782 Patent, 2:47-52. This fundamental technological limitation meant that trading systems could not differentiate between trading entities whose transaction patterns were beneficial to market liquidity and those whose patterns were detrimental, forcing all transactions to be processed identically regardless of their distinct computational and economic characteristics.

12. Moreover, prior art trading systems were unable to identify or respond to certain categories of trading entities that systematically caused losses to liquidity providers. As explained in the '782 Patent, "there is a class of trader known as 'toxic traders,' who appear to consistently have special knowledge about the direction of the price of a stock." '782 Patent, 6:32-34. The specification further explains that "[w]ith such traders, it can be expected that, more often than not, the price of shares of stock they are selling will usually drop shortly after they sell the stock, and the price of shares of stock they are buying will usually go up shortly after they buy it." '782 Patent, 6:34-40. Conventional trading systems and methods had no mechanism to detect these patterns or adjust processing accordingly.

13. This technological deficiency created a cascading inefficiency throughout the trading system. Because "[l]iquidity providers will usually not know if they are dealing with a toxic trader in any individual transaction," conventional systems required liquidity providers to compensate for unpredictable losses by uniformly "increas[ing] the bid/ask spread, resulting [in]

a slightly higher fee for all traders." '782 Patent, 6:42-46. Thus, the inability of conventional systems to differentiate trading entities based on their transaction histories resulted in inefficient pricing mechanisms that imposed unnecessary costs on beneficial trading entities while failing to appropriately price transactions with detrimental trading entities.

14. The inventions claimed in the '782 Patent addressed these technical problems through inventive systems and methods that associate trading entities with identifiers, acquire and store trade history information linked to those identifiers, generate computational profiles indicating whether transactions associated with particular entities would generate profits, and use those profiles to generate differentiated offers processed through the exchange.

15. Among the inventive concepts of the '782 Patent is the use of a semi-anonymous identification system that enables informed trading without revealing actual identities. This inventive concept is captured in the Claim 20 limitation of "associating a plurality of trading entities each with an identifier." The specification explains that this approach enables "informed, semi-anonymous, trading based on stored knowledge of the trading history of one or more of the participants, without revealing the exact identity of the trading parties." '782 Patent, 2:60-63. The identifier system allows "[t]akers [to] identify themselves by means of disposable profile identifiers that would relate each trade performed using the identifier with the profile." '782 Patent, 3:3-6.

16. A further inventive concept of the '782 Patent is the acquisition and storage of trade history information associated with the identifiers. This inventive concept is captured in the Claim 20 limitation of "acquiring trade history information including a histories of trading transactions associated with a plurality of said identifiers." As described in the embodiment disclosed in the specification, "[t]he liquidity Provider includes a local database that may store

trader profiles as a function of trade history associated with previous trade offers. This trade history may be received from a trade history feed unit in the exchange." '782 Patent, 4:38-41. The trade history feed unit "tracks the stream of trades that have been executed along with any associated identifiers, if present." '782 Patent, 4:42-44.

17. Another inventive concept of the '782 Patent is the generation of computational profiles that analyze trade histories to determine whether transactions would generate profits. This inventive concept is captured in the Claim 20 limitation of "generating profiles of said trading entities based on said histories, each said profile containing information that indicates whether trading transactions associated with a trading entity would generate a profit." The specification describes algorithmic implementations for this profile generation. For example, "the profile analyzer may compare the execution prices of an identified taker with the prices one minute later. The profile analyzer would subtract the prices from one minute later from the execution prices which the identified taker received for a variable labeled DIFF. Then, the profile analyzer would create a second variable, SIMPROF which was equal to the average of the negative of the value of DIFF for the cases in which the identified taker sold and the actual value of DIFF for the cases in which the identified taker bought." '782 Patent, 4:50-60. The specification further describes that "the profile analyzer may also compare the actual profits which the Liquidity Provider earned from the transactions of an identified taker. The profile analyzer would create a variable, ACTPROF which was equal to the actual profit which the Liquidity Provider earned from past cases in which the identified taker sold to or bought from the provider." '782 Patent, 4:66-5:5.

18. A further inventive concept of the '782 Patent is the generation of differentiated offers based on the computationally-generated profiles. This inventive concept is captured in the

Claim 20 limitation of "generating different offers to buy or to sell a trading item to different trading entities based on the profiles of individual trading entities, the offer being processed through an exchange that processes trading transactions for items having a bid/offer spread." The specification explains that "[p]roviders can use trading profiles to generate conditional offers. The offers are conditional to the identity of the Taker, such that separate offers are generated for individual Taker identities. Each provider may use different algorithms enriched by their own data to generate offers, and may store trading profiles in their own database or storage device." '782 Patent, 3:16-21. Thus, the claimed methods and systems employ specific technical architectures that transform raw transaction data into actionable trading intelligence through computational profile generation.

19. The method of Claim 20 resulted in concrete improvements to the efficiency of electronic trading systems. The specification explains that "[e]mbodiments of the invention can create value by increasing trade volume, which results from greater pricing variability enabled through increased disclosure of trading entity identity. A marketplace with informed trading parties and increased transparency is expected to offer better price matching, resulting in greater deal flow." '782 Patent, 4:19-24. This increased trade volume and improved price matching represents a measurable improvement in the computational efficiency of the trading system's matching algorithms.

20. The method of Claim 20 also improves efficiency by enabling more precise resource allocation within the trading system. The specification explains that by using the profile-based offer generation, liquidity providers "can adjust their prices to reduce the losses caused by toxic traders," while beneficial traders "do not have to pay higher prices to make up for the losses caused by toxic traders." '782 Patent, 6:55-58. This targeted pricing eliminates the

inefficiency of the prior art's uniform pricing mechanism, which imposed unnecessary computational and economic costs across all transactions to compensate for the undetected subset of detrimental transactions.

21. None of the methods or systems of the '782 Patent were previously performed by human beings, or capable of being performed in the human mind, as they necessarily involve computer systems processing streams of transaction data in real-time, generating statistical profiles through algorithmic analysis of trade histories, storing those profiles in database structures associated with semi-anonymous identifiers, and automatically generating differentiated offers based on computational profile analysis—operations that require the specific computational architecture described in the specification and that occur at speeds and volumes impossible for human cognition.

22. The electronic trading systems that existed when the application leading to the '782 Patent was filed were not merely configured to treat all order flow alike as a matter of policy or custom. They were built on a data architecture that had no mechanism for distinguishing among the entities whose orders they processed.

23. A prior-art electronic exchange maintained a central limit order book in which each entry consisted of a price, a quantity, a side, and a timestamp. The order book recognized a single undifferentiated class of order. An order for a given security was processed in the same way, against the same resting interest, under the same fee schedule, and at the same price increments, without regard to the characteristics of the entity on whose behalf it was entered. There was no order type by which a market participant could present to the exchange an order carrying any indication of the class of entity that originated it, and no mechanism by which the exchange could process such an order differently if one had been presented.

24. Prior-art exchanges disseminated executed trades over a public trade report feed carrying the security, the price, the size, and the time of execution. Those reports carried no persistent key by which the transactions attributable to a single trading entity could be recognized as belonging to that entity. The consequence was not that counterparty history was difficult to assemble. The consequence was that it could not be assembled from such records at all, because they contained no common field on which the records attributable to one entity could be joined. A set of records lacking a join key is not a history that has been withheld. It is a set of records from which a history cannot be derived by any amount of computation.

25. A second constraint, regulatory in origin but technical in effect, foreclosed the obvious workaround. The ‘782 Patent describes it: “Note that SEC mandated that exchanges make all quotes (and transactions) in full cents. Hence, a Liquidity Provider cannot legally compete by offering a fraction of a cent more to buy or less when selling.” ‘782 Patent, 6:66–7:3. Rule 612 of Regulation NMS, 17 C.F.R. § 242.612, in force at the time of the invention, prohibits any national securities exchange, national securities association, alternative trading system, vendor, or broker-dealer from displaying, ranking, or accepting any order, quotation, or indication of interest in an NMS stock priced in an increment smaller than one cent where the price is one dollar or more per share. The price field in a prior-art quote was not a continuous variable. It was quantized to a one-cent grid, and that grid was coarse relative to the differences in expected cost that distinguish one class of order flow from another.

26. These constraints operated together. A market participant could not derive per-entity transaction histories, because the records available to it carried no key on which to join them. It could not have expressed an entity-specific distinction to the exchange had it derived one, because the exchange recognized one undifferentiated order type. And it could not have

expressed the distinction through price in any event, because the price field was quantized to an increment coarser than the distinction itself. The method of Claim 20 required all three obstacles to be overcome, and prior-art systems overcame none of them.

27. The result was that liquidity providers had one response available to them, and it was a blunt one. As the '782 Patent explains, because "[l]iquidity providers will usually not know if they are dealing with a toxic trader in any individual transaction," they compensate by "increas[ing] the bid/ask spread, resulting [in] a slightly higher fee for all traders." '782 Patent, 6:42–46. The provider could price the population but not the participant, and it did so by moving a single number on a one-cent grid that every participant saw and every participant could execute against. The specification identifies the cost that fell on the entities whose order flow was in fact profitable to trade against: they "do not have to pay higher prices to make up for the losses caused by toxic traders" only once the system can tell them apart. '782 Patent, 6:55–58.

28. That response was computationally expensive as well as economically blunt. A market participant that cannot distinguish among entities before an order is generated can respond only after the fact, by withdrawing, repricing, and reposting a single undifferentiated quote in reaction to aggregate realized results. Each such adjustment takes the form of order entry, cancellation, and replacement messages directed at the exchange, each of which must be received, parsed, validated, sequenced, and applied to the order book by the matching engine, and each resulting book change of which must be published to every subscriber of the market data feed. The prior art's inability to differentiate among entities therefore produced message volume and matching-engine load that a system capable of differentiating does not require.

29. That the architecture of prior-art trading systems was deficient in the respects described above is not a proposition resting on Plaintiff's assertion alone. After the priority date

of the '782 Patent, national securities exchanges including the New York Stock Exchange, NASDAQ, Cboe, and IEX each built and deployed retail liquidity programs that do what the prior art could not: they recognize a distinct order type reserved for orders originating from an identified class of trading entity, they process those orders differently from other orders in the same security, and they apply different transaction fees, credits, and price increments to them. Those programs exist because an undifferentiated order book could not distinguish among classes of order flow, and because the one-cent increment imposed by 17 C.F.R. § 242.612 left no room within the quoted price to do so. The exchanges addressed the deficiency the '782 Patent identifies by building the architecture the '782 Patent describes.

30. One inventive concept disclosed in the '782 Patent is the binding of each of a plurality of trading entities to a persistent identifier that a computer system can read, store, and use as a key. The identifier is what permits transactions to be attributed to the entity that originated them, and it is the precondition of everything that follows. "Takers can identify themselves by means of disposable profile identifiers that would relate each trade performed using the identifier with the profile. Takers can create one or more profile identifiers, or chose not to use any identifier." '782 Patent, 3:3–7. In that disclosed arrangement the identifier is created by the taker, but what the claim requires is the association itself, between a plurality of trading entities and the identifiers by which their transactions can be recognized.

31. The identifier operates at the level of the trading entity rather than the natural or institutional person, which is what permits a system to act on the characteristics of an entity's order flow without the counterparty on the other side of a transaction learning whose order flow it is. The specification describes the consequence: the claimed techniques "enable informed, semi-anonymous, trading based on stored knowledge of the trading history of one or more of the

participants, without revealing the exact identity of the trading parties." '782 Patent, 2:59–63. Information sufficient to price a stream of order flow is made available to the system; information about who originates that flow need not be, and is not, disclosed to the party on the other side of the trade.

32. This inventive concept is captured by the first limitation of Claim 20, "associating a plurality of trading entities each with an identifier using a processor implemented at least partly in hardware." The limitation requires a plurality of entities each bound to an identifier, which is what makes the subsequent steps possible. It is the step that creates the key the prior art did not have.

33. A second inventive concept is the maintenance of trade history information in a form keyed to those identifiers, so that the transactions attributable to a given entity can be assembled and analyzed as a set. The specification describes the arrangement in its disclosed embodiment: "[t]he liquidity Provider 12 includes a local database 20 that may store trader profiles as a function of trade history associated with previous trade offers," '782 Patent, 4:38–41, and in that embodiment the history "may be received from a trade history feed unit 22 in the exchange 16," which "tracks the stream of trades that have been executed along with any associated identifiers, if present." '782 Patent, 4:41–44. What the claim requires is that the acquired trade history information include histories of trading transactions associated with a plurality of the identifiers, however that keyed information is obtained.

34. This is the step that converts an unjoinable record set into a joinable one. A participant operating on records that carry no entity key receives data from which per-entity histories cannot be derived; a participant operating on keyed records can aggregate. The

aggregation is not a better analysis of the same data. It is an analysis the prior art's data could not support, because the field on which it depends was absent from that data.

35. This inventive concept is captured by the second limitation of Claim 20, "acquiring trade history information including a histories of trading transactions associated with a plurality of said identifiers using a processor implemented at least partly in hardware." The operative language is "associated with a plurality of said identifiers." The claim does not recite acquiring trade history. It recites acquiring trade history that is keyed to the identifiers associated in the first step.

36. A third inventive concept is the reduction of an arbitrarily long keyed transaction history to a compact, persistent, machine-readable predicate that a downstream automated process consumes without human intervention. The profile is not a report, a display, or a summary presented to a person for consideration. It is a stored value against which an offer generator tests, and its content is specified; it indicates whether transactions associated with that entity would generate a profit. The claim is indifferent to the direction of that indication. A system practicing the claim may distinguish entities whose transactions are profitable to trade against from those whose transactions are not, and may price either accordingly.

37. The specification discloses algorithms by which such a predicate may be computed. In one disclosed embodiment the analyzer samples the price of the traded item at a fixed interval after each execution and differences it against the execution price. "[T]he profile analyzer 24 may compare the execution prices of an identified taker with the prices one minute later. The profile analyzer 24 would subtract the prices from one minute later from the execution prices which the identified taker received for a variable labeled DIFF. Then, the profile analyzer 24 would create a second variable, SIMPROF which was equal to the average of the negative of

the value of DIFF for the cases in which the identified taker sold and the actual value of DIFF for the cases in which the identified taker bought." '782 Patent, 4:50–60. The sign convention is the substance of that computation, normalizing buys and sells onto a single scale, and the specification requires the result to clear a statistical threshold before it is acted on. '782 Patent, 4:60–66. A second disclosed embodiment, ACTPROF, measures realized results against the entity rather than its mark-to-market outcome. '782 Patent, 4:66–5:5. These are disclosed ways of generating the required predicate. The claim requires a profile containing information indicating whether transactions associated with the entity would generate a profit, and does not confine the system to any one method of arriving at it.

38. This inventive concept is captured by the third limitation of Claim 20, "generating profiles of said trading entities based on said histories, each said profile containing information that indicates whether trading transactions associated with a trading entity would generate a profit." The limitation specifies what the profile must contain and what it must be derived from. It is a constraint on the content of a stored data object, not a direction to analyze information generally.

39. A fourth inventive concept is that the output of the method is not information delivered to a person but an offer generated as a function of the individual entity's profile, and submitted to an exchange that processes it according to its character. "Providers can use trading profiles to generate conditional offers. The offers are conditional to the identity of the Taker, such that separate offers are generated for individual Taker identities." '782 Patent, 3:16–19. Two entities seeking the same trading item at the same moment do not receive the same offer, because the offers are generated from their respective profiles.

40. The specification describes arrangements in which the differentiation is carried into the exchange's own handling of the resulting transaction. In one, the exchange itself "will give different quotes and transaction prices to different takers based on the takers' profiles." '782 Patent, 6:59–63. In another, "instead of adjusting the price of the security based on the profile of the taker, the exchange may offer different fees and rebates based on the taker profiles." '782 Patent, 6:63–66. In a third, "the exchange may let Liquidity Providers compete for the order flow of naive Liquidity Takers by offering to receive lower rebates," with the exchange compensating those takers "by charging lower fees for them to take liquidity." '782 Patent, 7:9–16. What unites these arrangements is that a transaction in a given security is no longer processed identically without regard to the entity behind it.

41. This inventive concept is captured by the fourth limitation of Claim 20, "generating different offers to buy or to sell a trading item to different trading entities based on the profiles of individual trading entities, the offer being processed through an exchange that processes trading transactions for items having a bid/offer spread, using a processor implemented at least partly in hardware." Two features of that limitation do work the Court's characterization of the claim does not capture. The offers must be different as between different trading entities and must be generated from the profiles of individual entities, which requires that the offer be a function of the entity rather than of the security alone. And the offer must be processed through an exchange of a specified kind, one that processes transactions for items having a bid/offer spread. That is the environment in which the one-cent quoting grid and the undifferentiated order book exist, and it is the environment whose constraints the claimed method is built to overcome

42. Taken as an ordered combination, the limitations of Claim 20 describe a loop running from the association of a key, through keyed transaction records, into a derived profile,

out through offer generation, and into an exchange whose processing of the resulting transaction differs from entity to entity.

43. The records available to a prior-art market participant carried no persistent entity key, with the consequence that per-entity histories could not be derived from them. The first and second inventive concepts supply that key and require that transaction histories be maintained in keyed form, converting an underivable history into a derivable one. The improvement is to the information content of a machine-readable data store.

44. Prior-art exchanges recognized a single undifferentiated order type and processed every order in a security alike. The third and fourth inventive concepts supply a basis on which orders can be differentiated before they are generated, and an offer whose character reflects that differentiation when the exchange processes it. The improvement is to what the system as a whole is able to express and act upon.

45. The one-cent quoting grid imposed by 17 C.F.R. § 242.612 meant the price field could not express fine distinctions among classes of order flow even where such distinctions could be drawn. The '782 Patent responds architecturally rather than by attempting to evade the rule, by permitting differentiation to be expressed through the fee charged, the rebate paid, and the price increment applied, none of which is quantized in the same way. '782 Patent, 6:63–66, 7:9–16; see also '782 Patent, claims 22–27.

46. The result is a system that does something no prior-art trading system could do, as distinct from doing something prior-art systems did and doing it faster. A prior-art exchange presented with an entity-specific order would not have processed it incorrectly or slowly. It would have had no order type by which to receive it, no basis on which to recognize the entity behind it, and no differentiated handling to apply to it. The function introduced by the '782

Patent is a function the prior art could not perform, and the retail liquidity programs built by the exchanges after the priority date confirm both the deficiency and the shape of its cure.

47. The claimed architecture resolves the entity-specific determination before an offer is generated rather than after a transaction has gone badly. A prior-art participant, unable to differentiate ex ante, could respond only ex post, by repricing a single undifferentiated quote in reaction to realized results, and that response takes the form of order entry, cancellation, and replacement messages directed at the exchange. Each such message consumes matching-engine resources for receipt, parsing, validation, sequencing, and application to the book, and each resulting book change is republished to every market data subscriber. A participant operating the claimed method makes the determination at the profile layer, before any message is sent, and generates an offer already differentiated for the entity it is generated for. The quantity of order-management message traffic required to express a given set of pricing intentions is correspondingly reduced, as is the matching-engine work and the market data publication load that traffic generates.

48. The claimed architecture also reduces the proportion of resting orders that go unexecuted. A matching engine must evaluate resting interest against each incoming order, and each resting order consumes memory in the order book for as long as it rests. A uniform quote widened defensively to cover the cost of undifferentiated order flow is, by design, priced away from the entities that would willingly trade against it, so more of it rests and less of it fills. Offers generated for the entity they are directed to are more likely to execute, which reduces the number of resting orders the engine must hold in memory and re-evaluate on each match cycle.

49. The profile is computed once from stored history and then reused across many offer-generation cycles. It is a persistent derived value, not a quantity recomputed for each order.

The specification places it in a durable store. '782 Patent, 4:38–41. Amortizing the cost of analyzing a long transaction history across many subsequent uses, rather than repeating that analysis per transaction, is a reduction in the computational work the system performs to produce a given set of offers.

50. That computation is performed away from the exchange and at the participant that generates the offers, which maintains its own store and its own analyzer. "Each provider may use different algorithms enriched by their own data to generate offers, and may store trading profiles in their own database or storage device." '782 Patent, 3:19–22. The architectural consequence is that profile analysis, which is the computationally heavy part of the method, is distributed across the participants that generate offers and is never placed on the exchange's matching path, where it would add latency to every order. The division of labor between the participant and the exchange is itself part of the claimed advance, and it is a division that leaves the latency-critical component of the system as simple as it was before.

51. The change to the exchange is a change in capability rather than in speed. A prior-art exchange applied one handling to every order in a security. A system practicing the claim processes transactions differently as a function of the profile of the entity behind the order, whether through the price, the fee, the rebate, or the increment applied. '782 Patent, 6:59–66, 7:9–16.

52. No prior-art electronic trading system maintained transaction histories keyed to persistent trading-entity identifiers for the purpose of generating entity-specific offers, and none recognized an order or offer whose processing by an exchange depended on the class of entity that originated it. Those capabilities did not exist in prior-art trading systems in any form. A capability that did not exist cannot have been well-understood, routine, or conventional.

53. Stored profiles derived from transaction history existed in other fields, but not in the form Claim 20 requires. The claim requires a profile keyed to a trading-entity identifier, derived from histories of trading transactions associated with a plurality of such identifiers, containing a predicate on whether that entity's transactions would generate a profit, and consumed automatically by a process whose output is an offer submitted to an exchange that processes transactions for items having a bid/offer spread. No prior-art trading system maintained such an object, because the inputs it requires were not available in such a system.

54. Even taking each recited component in isolation and assuming it to have been known, the arrangement of the four in the ordered combination recited in Claim 20 was neither routine nor conventional. The arrangement binds the key to the entity, carries it into the transaction records, derives the profitability predicate at the participant that generates offers, and expresses the resulting differentiation in an offer the exchange processes accordingly. Nothing in the prior art distributed these functions across the participants in a trading system in that way, and the distribution is not incidental. It is what allows a system to price order flow according to its characteristics without placing any analytical burden on the latency-critical matching path, and without disclosing to the counterparty whose order flow it is.

55. Claim 20 is not merely difficult for a human to perform. Its steps are of a kind a human cannot perform at all, irrespective of time or effort. The final step of Claim 20 is not satisfied until an offer has been generated and processed through an exchange that processes trading transactions for items having a bid/offer spread. No amount of human reasoning accomplishes that step, because the step consists of causing a change in the state of machines that a person has no mental access to. The same is true of the earlier steps, each of which is recited as performed using a processor implemented at least partly in hardware and each of

which operates on data held in machine-readable form. The claimed method operates on, and changes the capabilities of, computer systems a person cannot operate on by thinking.

### COUNT 1: INFRINGEMENT OF THE ’782 PATENT

56. Plaintiff incorporates the above paragraphs herein by reference.

57. **Direct Infringement**. Defendant has been and continues to directly infringe one or more claims of the ’782 Patent in at least this District by making, using, offering to sell, selling and/or importing, without limitation, at least the Defendant products identified in the charts incorporated into this Count below (among the “Exemplary Defendant Products”) that infringe at least the exemplary claims of the ’782 Patent also identified in the charts incorporated into this Count below (the “Exemplary ’782 Patent Claims”) literally or by the doctrine of equivalents. On information and belief, numerous other devices that infringe the claims of the ’782 Patent have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

58. Defendant also has and continues to directly infringe, literally or under the doctrine of equivalents, the Exemplary ’782 Patent Claims, by having its employees internally test and use these Exemplary Products.

59. **Actual Knowledge of Infringement**. The service of the original Complaint, in conjunction with the attached claim charts and references cited, constitutes actual knowledge of infringement as alleged here.

60. Despite such actual knowledge, Defendant continues to make, use, test, sell, offer for sale, market, and/or import into the United States, products that infringe the ’782 Patent. On information and belief, Defendant has also continued to sell the Exemplary Defendant Products and distribute product literature and website materials inducing end users and others to use its

products in the customary and intended manner that infringes the ’782 Patent. See Exhibit 2 (extensively referencing these materials to demonstrate how they direct end users to commit patent infringement).

61. **Induced Infringement**. At least since being served by the original Complaint and corresponding claim charts, Defendant has actively, knowingly, and intentionally continued to induce infringement of the ’782 Patent, literally or by the doctrine of equivalents, by selling Exemplary Defendant Products to their customers for use in end-user products in a manner that infringes one or more claims of the ’782 Patent.

62. Exhibit 2 includes charts comparing the Exemplary ’782 Patent Claims to the Exemplary Defendant Products. As set forth in these charts, the Exemplary Defendant Products practice the technology claimed by the ’782 Patent. Accordingly, the Exemplary Defendant Products incorporated in these charts satisfy all elements of the Exemplary ’782 Patent Claims.

63. Plaintiff therefore incorporates by reference in its allegations herein the claim charts of Exhibit 2.

64. Plaintiff is entitled to recover damages adequate to compensate for Defendant's infringement.

## JURY DEMAND

65. Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A judgment that the ’782 Patent is valid and enforceable

B. A judgment that Defendant has infringed directly and indirectly one or more claims of the ’782 Patent;

C. An accounting of all damages not presented at trial;

D. A judgment that awards Plaintiff all appropriate damages under 35 U.S.C. § 284 for Defendant's continuing or future infringement, up until the date such judgment is entered with respect to the ’782 Patent, including pre- or post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

E. And, if necessary, to adequately compensate Plaintiff for Defendant's infringement, an accounting:

i. that this case be declared exceptional within the meaning of 35 U.S.C. § 285 and that Plaintiff be awarded its reasonable attorneys fees against Defendant that it incurs in prosecuting this action;

ii. that Plaintiff be awarded costs, and expenses that it incurs in prosecuting this action; and

iii. that Plaintiff be awarded such further relief at law or in equity as the Court deems just and proper.

Dated: October 21, 2026

Respectfully submitted,

/s/ Isaac Rabicoff
Isaac Rabicoff
Rabicoff Law LLC
(admitted *pro hac vice*)
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
7736694590
isaac@rabilaw.com

**Counsel for Plaintiff**
**Cedar Lane Technologies Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system for the Southern District of New York and that ECF system will send a Notice of Electronic Filing to the CM/ECF participants in this case on the 21st day of October, 2026.

*/s/ Isaac Rabicoff*
Isaac Rabicoff
Rabicoff Law LLC
www.RabiLaw.com
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
773.669.4590
isaac@rabilaw.com

**Counsel for Plaintiff**
**Cedar Lane Technologies Inc.**